ALFRED JENKS,

Petitioner,

v.

LUIS SPENCER and
THOMAS F. REILLY,

Respondents.

Civil Action No. 05-10378-RGS

**PETITIONER'S MOTION TO STAY PROCEEDINGS**

**Now,** comes the petitioner in the above entitled matter. Where he respectfully supplicates to this honorable Court for a "stay" of the proceedings. So that he may have an opportunity to exhaust, his claim that he was deprived his inalienable right under the United States Constitution. To effective assistance of trial counsel.

The petitioner recently retrieved exculpatory documents that trial counsel had in his possession before the commencement of the petitioners trial.

Exculpatory documents that trial counsel elected to suppress.

Enclosed are the aforementioned documents, marked as exhibits ( A-M).

Enclosed are, as exhibits. The portions of the petitioners

trial transcripts that are pertinent to the aforementioned documents. Marked as exhibits, (N-O).

GROUND ONE: The petitioner was deprived his inalienable right to effective assistance of counsel, created by trial counsels failure to impeach two of the Commonwealth's witnesses with prior inconsistent testimony.

See, Nixon v. Newsome, 888 F.2d 112, "Trial counsel was ineffective in failing, during murder trial to impeach witness with prior inconsistent testimony"

GROUND TWO: The petitioner was deprived his inalienable right to effective assistance of counsel. Trial counsels decision not to call to the stand the witnesses that the investigator, that he hired interviewed. That would have gave testimony that corroborated the petitioner's self-defense claim.

See, Chambers v. Avmontrout, 907 F.2d 825, "Trial counsel's failure to call or interview eyewitness whose testimony would corroborate Petitioner's self-defense claim, fell below an objective standard of reasonableness."

The following is a summarization of the witness testimony that the petitioner is referring to in"ground one". The actual testimony is marked exhibit (N), and produced post.

Daliah Campbell, testimony before the jury.

P.216:

Q: Did you observe something take place?

A: Yes. I observed Lee say: That's Ferd, I was going over towards Ferd at the time when I noticed Alfred Jenks pull the gun out of his waist and say: What's up now?

P.217:

Q: So, when you observed him pulling something out from his waistband how far away was he from Lee?

A: At that time Lee had traveled to my left side. He was right here like probably as close as the jury is to me.

Q: And did you see Lee do or say anything to Mr.Jenks prior to him doing that?

A: When he pulled out the gun?

Q: No before that.

A: No,no. I just seen Leeth go over he said, there's Ferd, and he was going to say hi and went towards Ferd.

Q: Was anyone bothering Mr.Jenks when he pulled the gun?

A: Not that I seen,no.

Q: What did you observe him do when he pulled--well, did you say it was a gun?

A: Yes.

Q: What did he do when he pulled that out?

P.218:

A: I seen him pull it out of his waist and he said: What's up now?

When Daliah Campbell was interviewed by the investigator hired by the petitioners trial lawyer. She stated the following below and reproduced post as Exhibit (F).

> "Al came up to lee and asked what's up you punk. Lee bumped into him and I saw Al pull his gun out a 9 millimeter, like a cop's gun. I seen Ferd grab his hand and a fight started."

Trial counsel did not utilize this information to impeach Daliah Campbell pertaining to her inconsistencies on crucial elements before the jury. There is a distinct difference from her testimony given before the jury and the testimony given to the investigator.

Her testimony before the jury is a depiction of the petitioner, Walking up to Lee with the gun out saying "What's up now". See Exhibit (N) P.216,P.218, P.6.

IN contrast her testimony to the investigator is a depiction of the petitioner walking up to Lee and asked "What's up you punk", with no gun out. See, Exhibit (F).

Two different phrase's, two completely different scenario's. Unfortunately for the petitioner the only version the jury was aware of was adopted as truth and was delivered to them with out being contested, and has condemned the petitioner and plagued him on every legal proceeding.

Also Daliah Campbell depicted the individual Lee as not doing or saying anything prior to Mr. Jenks pulling a gun. See, Exhibit (N)

P.217

Q: And did you see Lee do or say anything to Mr.Jenks Prior to him doing that?

A: When he pulled out the gun?

Q: No before that.

A: No,no. I just seen Leeth go over he said, there's Ferd, and he was going to say hi and went towards Ferd.

Q: Was anyone bothering Mr.Jenks when he pulled the gun?

A: Not that I seen,no.

Again, when interviewed by the investigator hired by the petitioners trial lawyer. She stated the following below and reproduced post as Exhibit (F).

"Lee bumped into him and I saw Al pull his gun out"

Trial counsel did not utilize this information to impeach this witness to highlight her inconsistencies pertaining to these crucial elements before the jury. That version that was conveyed to the jury, that the petitioner pulled a weapon unprovoked. In a case where the petitioner's claim before the court was self-defense. To allow that version to go to the jury with out being contested was extremely prejudicial.

Charles Wesner, testimony before the jury.
Marked as Exhibit (|O).

P.90: Q: As he did that, was he looking or pointing in a specific direction?

A: He shot at--He shot in several different directions I think I would have to say he was shooting looking for somebody or shooting to shoot for somebody.

When Charles Wesner was interviewed by the investigator hired by the petitioners trial lawyer. He stated the following below and reproduced post as Exhibit (|E).

"I don't think he was aiming at anyone."

"He said he did not see Al Jenks aiming at the crowd or anyone in particular"..

Trial counsel did not utilize the information he received from the investigator to impeach this witness on this most crucial element of intent. The trial lawyer allowed this testimony to go to the jury with out being contested. And therefore adopted as truth. This witness flip-flop on the issue of intent altered the outcome of the trial. He was the only Commonwealth witness that testified that the petitioner was "looking to shoot somebody or shooting to shoot somebody" after he rose up from the floor. In a homicide trial where the commonwealth's theory of murder is predicated on the contention that the petitioner formed the intent to kill in a time span of (|2.5 seconds), this testimony was critical to there case.

The following is a summarization of the witnesses the petitioner is referring to pertaining to "Ground Two".

Trial counsel hired an investigator to interview witnesses during to course of his investigation he interviewed, Ferd casimir, his testimony is marked Exhibit (G) and reproduced post. He stated the following information to the investigator.

> "Al stood next to me", "Lee walked up to Al and punched him in the face. Al didn't do anything to him first." Then I see Al pull gun from his pants."
> "There was a lot of them and they were going to kill; him he defended himself." "Al shooting was self-defense definitely self-defense." "The police questioned me several times."

Daliah Campbell, testimony before the jury placed Ferd Casimir at the scene and involved in the altercation. However compare Her recollection of the event's that night, to his.

See, Daliah Cambells testimony marked Exhibit (N) P.216,states.

> "Q: Did you observed something take place?
>
> A: Yes. I observed Lee say: That's Ferd, I was going over towards Ferd at the time when I noticed Alfred Jenks pull the gun out of his waist and say: What's up now?

The petitioners trial lawyer did not call this witness to the stand to testify on behalf of the petitioner's defense. His testimony was material and would have impacted the jury's verdict.

The investigator also interviewed one Kisha Walker, her testimony is marked Exhibit (I) and reproduced post.

Kisha Walker, conveyed the following to the investigator.

> "Al got the gun and Ferd jumped back. When they were fighting, shots went up in the air, then he started shooting all around. He was not aiming".

Trial counsel did not call this witness to the stand to testify on behalf of the petitioner.

See, Lord v. Wood cite as 189 F.d 1083 (9th cir 1999) states,

> "A Lawyer who fails adequately to investigate and to introduce into evidence, [information] that demonstrates his clients factual innocence or that raises sufficient doubt as to that question to undermine confidence in the verdict renders deficient performance."

Trial counsel's decision making relieved the Commonwealth of there burden to prove beyond a reasonable doubt every element of the crime, by not challenging there evidence.

The result is that the adversarial process was undermined and the trial can not be relied on as producing a just result.

The petitioner prays that for the reason set forth in the instant motion, the this Honorable Court will "stay" the proceedings in the above captioned matter.

Respectfully Submitted,

Alfred Jenks pro se,
P.O. Box 43

Norfolk Ma, 02056

Alfred Jenks

12/13/05



The New England Group Inc.

INVESTIGATIONS, SECURITY, PROTECTION

(617) 598-1623 (24 Hours)

MASSACHUSETTS
LICENSED & BONDED

JOSEPH M. KOSTKA
PRESIDENT

102 EUTAW AVE.
LYNN, MA 01902

Exhibit C ([redacted])

August 18, 1994

Benjamin Entine, Esquire
120 Washington Street
Salem, MA 01970

CASE NO: 7-15-94
CLIENT: Alfred Jenks

ASSIGNMENT:

Per order Benjamin Entine. Investigate events involving a fatal shooting at 36 Market Street, Lynn, on April 2, 1994.

REPORT:

6/28/94: Met with Benjamin Entine, Esquire, and received details and instructions relating to a shooting on 4-2-94 at the Lynn Sports Club, 36 Market Street (third floor), Lynn, Massachusetts.

7/18/94-7/29/94: Investigator made several phone calls attempting to set up interviews with over 20 witnesses. This proved difficult as several phones had been disconnected. Some witnesses had moved and most had answering machines. After several attempts to contact the witnesses with answering machines were unfruitful, messages were left--also with negative results.

8/3/94: Investigator went to the Lynn Public Library to research newspaper articles relating to this incident (attached).

8/5/94: Investigators went to Boston to interview witnesses. After checking for 7708 Morton Street, Boston, and finding no such addressed existed, the investigators met with Boston Police. Boston Police confirmed that no such addressed existed and also stated that Jay Mixxx and Necy Mixxx, as listed on Lynn Police Incident Report No. 94/5879, were fictitious names as well as the fictitious address. Investigators then proceeded to 18 Rosa Street, Hyde Park, to interview Jacque Pierre. Attempts had been made to contact Mr. Pierre by phone but the phone (617-364-5312) had been disconnected. A woman who said she was Mr. Pierre's mother stated that he was not at home and the new phone number is 617-364-2007.

Investigators then proceeded to 36 Market Street to attempt to gain access to the third floor. The third floor was secured and no access was gained.

8/6/94: Investigators interviewed Laurie Ledgister, whose last name was Galante at the time of the incident. Mrs. Ledgister's statement is attached. She has moved out of state to join her husband Clovs Ledgister (also a witness) in Pennsylvania. She was assisting at the front door and saw more than one gun.

Investigators interviewed Calvin Johnson, a nineteen year old, regarding the incident. Mr. Johnson was reluctant to say much. Mr. Johnson's sister was present and she did not want to say much either. She agreed with her brother's version of events.

Investigators phoned the Lynn Police at approximately 6 p.m. to speak with Officer Paul Holey with regards to discrepancies in his report (#94/5879), such as proper identification for the individuals Jay and Necy Mixxx and their real address. The police officer on the phone instructed the investigators to come down to the police station and Officer Holey would speak with them. Investigators went to the police station and the desk officer (Brian) told them to wait and Officer Holey would be in in a few minutes. After 20-30 minutes, the desk officer was again asked how long it would be and he responded: He'll be in in a few minutes; he just has to clear from a call. The investigators waited approximately two hours with negative results. Every time the desk officer was asked, he said: He'll be in in a few minutes.

After leaving the station, the investigators called the Lynn Police at 9: 15 p.m. and left a message requesting Officer Holey to call. At 9:35 p.m., Officer Holey called and stated that he would not talk to the investigators. He said: You have my report; if you want to talk to me, you can talk to me on the stand in court.

8/7/94: Investigators interviewed Hans Casimir at his place of business. He confirmed some of the information in his statement to Lynn Police but also noted several exceptions including not giving full names or addresses of people. Also interviewed at this same address was Shirley Gilmore, who was working the front door on the night in question. Next, Ms. Barbara Beyson was interviewed, as was Niamea Jefferson. These women did not see the incident.

Kisha Walker was interviewed next. Her address and phone number have changed since April 2, 1994. She now resides at 55 Warren Street, Lynn, with a phone number of 617-595-7226.

Wesner Charles and Eva Murat were interviewed together in an apartment they share at 17 Moulton Street, Lynn.

8/10/94: Investigators interviewed Mark Edison at his residence. His sister, Nora, was out of state but Mr. Edison assured investigators that his sister could provide no different details regarding this incident.

Investigators next interviewed Robert Kinos Bakoian, who is 19 and was consuming alcohol at the Sports Club during the party on April 2, 1994.

Daliah Campbell, Urzula Nonan's sister, was interviewed. She no longer lives at 16 Albany Street, Lynn. Now Ms. Campbell resides with her mother at 4 Princeton Terrace, Lynn, MA. Ms. Campbell stated that there was a lot of drinking by a lot of people that night. She went on to say that minors were drinking also and that this was a regular thing at this club.

In her statement to Detective Danie Fee on April 4, 1994, Ms. Campbell stated that Al Jenks landed on his back on the sidewalk after he jumped out of the third floor window and that two males walked him towards a parking lot across the street.

In the version Ms. Campbell gave to investigators on August 10, 1994, she stated that when Al jumped he hit Tasha Mazil and then he was picked up and put into Bob's gray Mustang.

Windy Whittman was also interviewed at this time. She lives in the same building but not the same apartment.

Alex Nonon, Urzula's brother, was also interviewed at this apartment. He stated that he tried to use the phone right away but a Henderson Maynard (manager) would not let him due to all of the underaged drinking. Mr. Nonon stated it took the police a long time to show up and it took the ambulance a long time to arrive. He also said the EMTs came up to the third floor without their equipment.

8/12/94:  Ferd Casimir was interviewed at his place of business:
15 Central Square, Lynn, MA.  Mr. Casimir was providing security
inside the club that night.  He went on to say that Lee punched
Al Jenks in the face and that was how the fight got started.  He
was later arrested for an incident which occurred at the Nonon
residence, 4 Princeton Terrace, Lynn, MA.

There are still witnesses to be interviewed and access to be
gained at 36 Market Street.  When access is gained, pictures will
be taken of this site.

Respectfully submitted,

Joseph M. Kostka

Exhibit

#7-15-94

INTERVIEW OF WESNER CHARLES, 17 MOULTON STREET, LYNN, MA
TELEPHONE: 617-598-7231
DATE OF BIRTH: SEPTEMBER 4, 1972
TUESDAY, AUGUST 9, 1994

INVESTIGATORS JOSEPH M. KOSTKA AND MICHAEL A. SLOMICH PRESENT.

Mr. Charles stated that he arrived at the club between 10 p.m. and 11 p.m. on April 2, 1994. He was with his girlfriend, Eva Murat.

I turned around and saw a fight. I saw someone going towards the fight with a gun. Someone grabbed his hand. At one point, the gun was on the floor when Al fell. He grabbed the gun back and the guys fighting with him ran. He started shooting everywhere. [redacted]. The first two shots were straight up in the air.

I remember one shot in particular was at another wall. I was standing up; everyone else was lying down or running. I was very nervous so I didn't move. I really don't know Al Jenks that well but I was 11 or 12 feet in front of him during the shooting and looking him straight in the eyes. Al got up, went by me and shot some more, maybe five shots in all.

Someone threw a kick at the hand with the gun in it but didn't get the gun out of Al's hand. Al then ran downstairs and an altercation occurred down there with people trying to hold him down. I went downstairs looking for my girlfriend, Eva Murat, and her sister's friends.

I then went back upstairs. I saw Urzula and she was breathing and bleeding a lot. I took off my shirt and wet it to wipe off her face and held her. As I spoke to her, she could give me answers by nodding her head but she couldn't speak.

I stayed with Urzula until the police came. She was still alive when the ambulance crew got there. It took them quite a while to get there.

A guy found a shell and give it to me and I gave it to the police. I only saw one gun. I had one wine cooler that I bought there.

Mr. Charles confirmed the information in his statement given to Detective Lieutenant Edward Kiley on April 4, 1994. [redacted], [redacted] [redacted] [redacted]." He went on to say that he did not know or give the addresses of the people named in that statement. [redacted] [redacted].

Exhibit

#7-15-94

INTERVIEW OF DALIAH CAMPBELL, 4 PRINCETON TERRACE, LYNN, MA
TELEPHONE: 617-596-9966
DATE OF BIRTH: 4-22-69
WEDNESDAY, AUGUST 10, 1994

INVESTIGATORS JOSEPH M. KOSTKA AND MICHAEL A. SLOMICH PRESENT.

Me, my sister and my cousin got to the club between 10:30 and 11 p.m. I told my sister that something might happen. I just felt weird or funny so I went home and changed into dungarees.

They searched us all at the door. Shirley didn't search me the second time I went into the club. I was back by 12:15 a.m. My cousin's ex-boyfriend, Lee, was downstairs and he said someone said they were going to kill him. My sister, Urzula, had Lee let her use his Cellular phone.

I seen Wallen (Esperence) come down crying and wouldn't tell me what happened. When Al jumped, he hit Tasha Mazil.

Al was out of it. They picked him up and helped Al to Bob's grey Mustang.

The police came and they pulled out their guns and wouldn't let us go back upstairs. Alex tried to pick Urzula up because Henderson wouldn't let them call the cops because he was serving drinks to minors. My niece, who is under age, bought beer. Winifred Sufred is 15 and Stanley, Digger's nephew, is 16 and both bought drinks from Henderson.

Urzula had bought a drink for me from Henderson before. I'm old enough to drink but she shouldn't have been able to buy.

It took a long time for the EMT's to get there and then they went upstairs without their bags at first. They had to go back down and get their bags to treat her.

Ms. Campbell confirmed the information contained in her statement to Detective Lieutenant Edward Kiley on April 4, 1994.


ƎX/ƖƖᵢᵦᵢⱦ

#7-15-94

INTERVIEW OF FERD CASIMIR, 48 TIMSON STREET, LYNN, MA
TELEPHONE:   617-581-2071
DATE OF BIRTH:   7-5-67
SOCIAL SECURITY NUMBER:   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
FRIDAY, AUGUST 12, 1994

INVESTIGATOR JOSEPH M. KOSTKA PRESENT.  THE INTERVIEW TOOK PLACE
AT MR. CASIMIR'S PLACE OF BUSINESS:  MANHATTAN FASHION,
15 CENTRAL SQUARE, LYNN, MA.  TELEPHONE:  617-598-2421.

     I got in the club at midnight.  My sister-in-law (Shirley)
was at the door with Laurie.  I told my brother, Hans, to go to
the door to do searches.  The week before some kids were fighting
and a bottle was thrown.

     Everybody was dancing and Henderson was at the bar.  He was
the man we rented the club from.  He sells the beer and sodas,
not us.  I was talking to everybody--all the kids--telling them
not to fight like last week.

     "Somebody told me that someone had a gun in the club.  I was
drinking but I had to keep security to the people."  I called
Digger's niece, Blondine, to the bathroom because she was
supposed to have a gun.  I searched her and her purse but no gun.
By the time I got back to the hallway, I see Al and Billy Bob
(Robert Kinos Bakoian) talking to two Haitians.  Fritz was
fighting; he started the fight.  He had 40-ounce bottle.  I took
it away from him.  He's too young to drink.

     There were five guys in the bathroom.  I did security for
three years in New York and here.  I know people; I'm like a cop.
I told Victor to keep an eye on bathroom and I left.

     I see Al and Bob coming back to dance floor. ▓▓▓▓▓▓▓▓▓▓▓▓t
▓▓▓▓▓.  I was drinking Guinness and dancing.  Digger is across
the floor; he had a problem with Al a long time ago.  Hans came
up to me and said:  There is a beef going on in the party.

     ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓te.  Al didn't
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.  ▓▓▓▓▓▓▓▓ ▓▓ puff gun from his pants.
Nine millimeter; I know guns.  I held his hand down.  Lee reached
over me and punched Al a few times while I was holding him--his
nose started to bleed.  I yelled "gun" and everybody started
running.

     Someone pushed me; I think it was Digger.  He pushed me and
Al down.  I lost control of Al.  He started shooting up in the
air into the ceiling.  I didn't see all of shooting.  I was lying
down on the ground.  I tried to get up to grab him again to stop
him. ▓▓▓▓▓▓▓▓▓▓▓▓▓▓ of them and they were going to kill him. he
▓▓▓▓▓▓▓▓▓▓▓▓.

I saw Al run down to the stairs. I think the gun was jammed. He jumped on Lee and started fighting with him. Al's nose was bleeding. The crowd went downstairs.

There were gunshots downstairs. I saw my brother, Hans, and Junior pulling Al back up--he was fighting with Lee and one of his friends on the third floor. I saw a lot of people coming up the stairs with knives and chasing Al. They hit Al with bottles.

He jumped out of the window on the third floor. I stayed with Urzula; I was close with her and her family.

Urzula's family mad; they destroyed my car. Urzula's brother had my car so I went to get it. I went to the police station and a cruiser gave me a ride to Princeton Terrace. I went to their door and they punched me.

In Haiti, I used to stab and shoot people. I went to my car; it was destroyed. They said: they couldn't find Al so they will kill my two brothers. They hit me with pipes in the face and everywhere. I was fighting my way out. Ricardo Sawnbird stabbed me and I stabbed him. Someone had hit me with a brick. I thought I was going to die.

[redacted]. I told them Lee didn't push me down, Digger did. Alex had my portable phone.

Mr. Casimir confirmed the information contained in his statement to Massachusetts State Trooper Norman C. Zuk on April 2, 1994 with the exception noted above.

To: File
From: Sergeant Dennis Marks
Subject: Signed interview of Robert Kinos Bakoian, 2-7-75, 016548831, 34 Basse Rd, Lynn, Tel# 599-1403, on 4-2-94. Present at interview Sgt Dennis Marks, Tpr Norman Zuk and Lt Dennis Flynn, Lynn Police.

Start 1300 hrs

I went to Market Street party at around 8:30-10:00 PM. I was drinking beers 3-4 beers. I smoked some weed too. This was before I went there.

I met up with Alfred Jenks. Also J. ( Fred Casimir).

I was in the bathroom. I was arguing with this Haitian kid from Boston. Jr. was there. Jr. broke up the argument. We came out of the bathroom. I bought a Heinegan for 3 dollars at the bar.

Music playing. All of a sudden there were approximately 6 Haitian kind from Boston. One of them bumped into Al. Words were exchanged. I saw the Haitian kids surround Al. The next I saw was Al leaning in the corner against the speakers and then I heard a gunshot. I bolted for the door and heard more gunshots behind me. The gunshots I heard were from the area where Al and the Haitian kids were. It was dark there.

I ran down the stairs. I got outside. I was standing in the middle of the street. I heard a Haitian lady say someone ( cousin-relative ect. ) got shot. I saw 7-8 Haitian kids run up the stairs to the club. Approximately 1 minute later I saw Al jump through the 3rd floor window. He came down feet first and then he went through the overhang of the street ( awning ) and landed onthe cement sidewalk.

A black male with dreadlocks was standing on sidewalk across the street. He went over to help Al.

Jason Tagliere, Andre ( b/m ) were helping him up and brought him across the street.

I was standing at my car with door open ( drivers ) and keys in ignition.

All of a sudden I heard and then saw approximately 9 dudes, Haitian dudes, the ones from Boston coming across the street.

I ran around my car toward City Hall. I looked back and saw Al hop a fence behind Brothers to go to St. Mary's. Jason and Andre also scattered. I don't know where.

Approximately 5-6 minutes later I hid behind a car around City Hall. I came back. Cops were not there yet. My car door was still open, drivers side. Keys were still in ignition. I jumped in and drove out down Commons. Took ride to Revere, Everett. Rolled joint and then went home.

My car is my mothers, Ford Mustang, 1988, Grey, 2 door. Mom is Marilyn Bakoian, same address. Got home around 1:30-1:45AM

Earlier that night 6-7 I was with Al. at his house ( his fathers home Sagamore St )

END 1329

ExHibiT

#7-15-94

INTERVIEW OF KISHA WALKER, 55 WARREN STREET, LYNN, MA
TELEPHONE: 617-595-7226
TUESDAY, AUGUST 9, 1994

INVESTIGATORS JOSEPH M. KOSTKA AND MICHAEL A. SLOMICH PRESENT.

On April 2, 1994 Ms. Walker was 19 years old but now is 20 years old. She stated that Al Jenks was arguing with Digger Dunn (street name for Wallen Esperence) over an old argument.

Ferd was fighting with Al and a gun came out and slid across part of the floor. It was a black gun with a thing that turned a revolver.

Al got the gun and Ferd jumped back. When they were fighting, shots went up in the air, [redacted]l [redacted]. [redacted]g.

I ran into the kitchen and then he ran into the kitchen looking for a way to get out. He couldn't so he left the kitchen. I didn't see him again.

[redacted]. One week before the shooting, there was a fight between some Lynn kids.

#7-15-94

INTERVIEW OF CALVIN JOHNSON, 122 CHESTNUT STREET, LYNN, MA
TELEPHONE:  617-581-1278
SATURDAY, AUGUST 6, 1994

        I saw Al shoot.  He just shot up in the air, not at the
people.  He was real drunk.  Al jumped out the third floor window
and five friends carried him into a car.  That's all my sister or
I saw.

#7-15-94

INTERVIEW OF HANS CASIMIR, 151 LAWTON AVENUE, LYNN, MA
TELEPHONE: 617-599-6893
DATE OF BIRTH: 10-1-65
SOCIAL SECURITY NUMBER: 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
TUESDAY, AUGUST 9, 1994

INVESTIGATORS JOSEPH M. KOSTKA AND MICHAEL A. SLOMICH PRESENT. THE INTERVIEW TOOK PLACE AT MR. CASIMIR'S PLACE OF BUSINESS: MANHATTAN FASHION, 15 CENTRAL SQUARE, LYNN, MA. TELEPHONE: 617-598-2421.

I was running the party. I thought everybody was friends; there were no fights before. Al and a guy from Boston were arguing. I talked to the guy from Boston--he said no problem.

Hans split the man from Boston away from Al Jenks, but the man's friends were around. Freddy took Al over by the stage.

One of the other guys punched Al. There were maybe 10 to 15 guys from Boston there together. Al pulled the gun out and my brother, Ferd, grabbed him and other people punched Al again. Al fell down and then got up and shot in the air. I yelled "stop it" and people started running.

[redacted]e. He shot at the wall while people were running down the stairs.

Al started running down to the stairs by the door. Another guy grabbed Al's hand with the gun in it. I reached Al with the guy holding his hands. People were still hitting him. One tried to hit Al with a table.

I pulled the gun away from Al and threw it to my brother, Junior. My brother, Junior, threw the gun on the speaker and we grabbed Al to bring him back so people don't get him.

Ten to fifteen people from Boston came back after Al and ran me right over and chased Al to the bathroom. Al jumped out the window. One of the guys chasing him had a knife.

We didn't sell any soda or booze. Henderson Maynard sold the drinks. The statement given to Detective Lieutenant Dennis Flynn on April 3, 1994, stated that Hans sold the soda.

Hans went on to say that he did not see Al Jenks pull the gun at all. He did not see Al back up with the gun. [redacted]. My brother, Junior, threw the gun onto the speaker. He did not pass the gun to the owner of the club, Henderson.

When we got the gun away from Al, we were on the second step, not the second floor. I can't remember what type of gun it was. I didn't see any other guns.

The Haitian people from Boston just came to fight.

Mr. Casimir confirmed some of the information contained in his statement to Detective Flynn but did not give addresses or full names of people. He also mentioned the other exceptions as noted above.

THE COURT: No.

Daliah Campbell may be called.

DALIAH CAMPBELL, SWORN

DIRECT EXAMINATION

BY MR. SHEA:

Q Good afternoon, Ma'am.

A Good afternoon.

Q I want you to speak up loud enough so all the members of the jury can hear you and everyone else in the courtroom. All right?

A Okay.

Q First, state your full name and please spell your last name.

A Daliah Campbell. Last name is spelled C-A-M-P-B-E-L-L.

Q Because you have an unusual first name, spell that for the Court Reporter, too.

A D-A-L-I-A-H.

Q How old are you?

A Twenty-six.

Q And where do you live presently?

A Right now?

Q Yes.

A I live in Brooklyn, New York.

Q Did you briefly live in Lynn, Massachusetts?

A Yes, I did.

Q How long did you live in Lynn, Massachusetts?

A About nine years.

Q And when did you move to New York?

A In August of'95.

Q In 1994 you were living in Lynn?

A Yes, I was.

Q Was Ursula Nonon your sister?

A Yes, she was.

Q Were you present at the party at 36 Market Street on the evening she was killed?

A Yes, I was.

Q Can you tell the members of the jury what time you went to the dance on that evening and who you went there with?

A The time must have been about eleven, quarter to eleven. It was like eleven something. I'm not sure exactly for the actual time. I went with my sister Ursula, my cousin Wendy and my girlfriend Tanya.

Q Where were you living at the time?

A Four Princeton Terrace.

Q Is that where your mother lives or lived at the time?

A Yes.

Q Was Ursula living there as well?
A Yes.
Q When you went there with Ursula that night, what was the first thing that happened when you got there?
A The first thing when I got there, we bumped into some friends of ours and we was up there laughing and joking.
Q Was this upstairs?
A Oh! All right. Going upstairs, when we was coming up, we bumped into Shirley and some other girls that was at the door. They were searching.
Q You are speaking about Shirley Gilmore?
A Yes.
Q Did you have a relationship of some kind with Shirley at the time?
A Me and Shirley was friends.
Q How long were you friends?
A We was friends for at least four, five years.
Q Were you close friends or just casual friends?
A We was kind of close, yeah.
Q So, when you went there that night, you observed that people were being searched that went in?
A Yes.
Q Did you pay to get in that night?

A No, not I. But my sister Ursula and my cousin Wendy did.

Q Why isn't it that you didn't pay to get in?

A Because me and Shirley were friends.

Q Did you get searched?

A No, I didn't.

Q What about the others?

A My sister got searched and my cousin got searched and Tanya got searched.

Q At any rate, you all went into the dance?

A Yes.

Q You didn't have a gun with you, did you?

A No.

Q Did you have a boyfriend or fiance at the time?

A Yes, I had.

Q Who was that?

A Wallen Esperance, but he was known as Digger.

THE COURT: Digger?

THE WITNESS: Yes.

Q Was he also known as Pareisi?

A They used to call him Pareisi.

Q Did you see him there that night?

A I did.

Q Did he have a gun?

A No.

Q Once you went into the dance, what happened? What did you do?

A We was at the dance. I wasn't feeling right. I felt something was going do happen, so I left and went home and changed into jeans and sneakers and a sweatshirt and then I came back to the dance. When I left, I left my sister and my cousin there. Me and Tanya left.

Q How long was it that you were gone from the dance before you returned?

A About ten minutes.

Q Were you pregnant at the time?

A No. I just had my baby.

Q You just had your baby?

A Yes.

Q So, when you came back to the dance after changing, at some point was your attention directed downstairs again?

A Yes. Someone came upstairs and said that Lee was downstairs and Lee had said someone just had threatened him.

Q When you refer to Lee, you are talking about Mr. Delva that just left the courtroom?

A Leth Delva, yes.

Q How long had you known him on that day?

A I knew Lee for about seven years.

Q How was it that you knew him?

A He was my cousin's ex-boyfriend at the time.

Q He used to date your cousin?

A My cousin Wendy, yes.

Q After they stopped dating did he still remain friendly with your family?

A We lost contact for awhile and then, you know, it was like Wendy was nine months pregnant when this happened and when she got about eight months pregnant she started calling him and they started conversing over the phone, because they were always like good friends.

Q So he and Wendy had renewed their friendship at the time?

A Yes.

Q When was the last time that you had seen him prior to that night?

A I can't remember, it was so long ago.

Q At any rate, once you learned that there was a problem downstairs involving him, did you do something?

A We went downstairs and we told him, you know, he said like: Somebody just threatened me. I don't know who he is. I don't know him and stuff. I

told him. Don't worry about it. They are searching upstairs. Come on and let's go in.

Q Did he appear to be upset?

A Yeah, he was kind of mad.

Q What happened when you went upstairs?

A We came upstairs and Shirley started searching him again and --

Q Excuse me. I don't mean to interrupt you. Did you tell Shirley or anyone upstairs about what had transpired downstairs?

A No, I don't think so. No.

Q At any rate, did you observe whether or not Mr. Delva was searched before he went in?

A Yes, he was.

Q So, after he was searched, did the group of you go into the dance?

A Yes, we did.

Q Did he tell you the name of the person who had threatened him?

A He said he didn't know him. He said he didn't know who the person was.

Q So, once Mr. Delva was there, you went into the dance together?

A All right. We went into the dance. We went towards the women's bathroom in the dance hall.

We went there and Lee was talking to my sister. My sister asked to use his cellular phone. He handed her the cellular phone and we went back out towards the dance floor, me and Lee.

Q You and Lee went out past the bar?

A Yes.

Q When you got out there, what did you do?

A Me and Lee were standing there. I was standing on the right side of Lee. No. I was standing on his left and he was standing on my right and Ferd was standing over near the stage.

Q Ferd is Ferd Casimir?

A Ferd Casimir, yes.

Q As you moved into the dance floor, did you stay or did you stay in that position?

A I was on the dance floor but not near the middle. I was more near the door area at the time.

Q Did you observe something take place?

A Yes. I observed Lee say: There's Ferd. I was going over towards Ferd at the time when I noticed Alfred Jenks pull the gun out of his waist and say: What's up now?

Q You pointed to Alfred Jenks just then seated here in the courtroom?

A Yes.
Q Did you know him prior to this date?
A I seen him with Junior Casimir but I never knew him, like me and him holding a conversation, no.
Q But you knew who he was?
A Yes.
Q So, when you observed him pulling something out from his waistband how far away was he from Lee?
A At that time Lee had traveled to my left side. He was right here like probably as close as the jury is to me.
Q And did you see Lee do or say anything to Mr. Jenks prior to him doing that?
A When he pulled out the gun?
Q No. Before that.
A No, no. I just seen Leth go over he said, There's Ferd, and he was going to say Hi and went towards Ferd.
Q Was anyone bothering Mr. Jenks when he pulled the gun?
A Not that I seen, no.
Q What did you observe him do when he pulled -- Well, did you say it was a gun?
A Yes.
Q What did he do when he pulled that out?

A I seen him pull it out of his waist and he said: What's up now?

Q Who was he looking at?

A To me it looked like he was looking towards Lee.

Q What happened next once he did that?

A When he pulled the gun out, Ferd jumped over towards where Al was holding the gun in a downward position and telling him to let it go.

Q What happened after Ferd grabbed his hand?

A They just started tumbling and tumbling and Leth was going towards Al still and they were tumbling and tumbling until they ended up near the stage inside the hall.

Q So there was a group of people tussling?

A Yeah. Trying to get away the gun, telling him to let it go. That's why we made a lot of screaming: Let it go. Put it down. What's wrong with you? You're crazy.

Q People addressing Mr. Jenks?

A Yes.

Q Was it one person or more than one?

A I just heard "Let it go" and a lot of screaming. I don't know if it was the same person or more than one person. I just heard it being said and a lot of screaming.

Q Did you hear anything after that struggle began to move to the stage?

A No.

Q Did you hear a sound at some point?

A Yes. I heard a gunshot go off.

Q Once the gunshot went off, what did you do?

A I headed down the stairs. Everybody was running out towards me, towards -- I was standing near the doorway and everybody was running towards me and we ended up tumbling downstairs.

Q You went downstairs as the gunshots began or afterwards?

A No. I probably went like after the first one had went off. Like about the second one when I started towards the steps.

THE COURT: Is this an appropriate time to suspend?

MR. SHEA: Yes, your Honor, I think it is.

THE COURT: I am sorry. We have come to four o'clock when we always break.

I will ask you to please step down. You are still under subpoena here, so we will need to start up with your testimony first thing at nine o'clock tomorrow morning.

THE WITNESS: Okay.

THE COURT: You may step down at this time.

(Witness complied.)

THE COURT: Ladies and gentlemen, you of heard some of the evidence. You of not heard all the evidence at this point. In fact, we have just begun the first day of the evidence. So, don't try to make up your minds at this point. Instead, go home. Have a good evening.

I often find with a criminal case the best thing for you to do is to treat it like a piece of luggage. That is, leave it, just like a suitcase, right here in the courthouse. Go home. Don't think about it. Come on back tomorrow after you are refreshed and all and pick that suitcase up and come back into the courtroom. Then we will resume at that time.

I thank you very much for your attention today. If you will, leave your notebooks on the chairs and I will see you all tomorrow. I thank you so much for being prompt this morning. Tomorrow we will not begin until nine o'clock. But, if you will, all come here sometime before nine so we can begin promptly at nine.

(Jurors excused.)

THE COURT: Any matters that I need to address at this point?

MR. SHEA: There is one matter that came to my attention this afternoon at the lunch break. There was a witness I wasn't previously aware of by the name of David Brazil who will testify similarly to some of the other witnesses. He is not on my witness list. I don't believe he ever made a statement to the police that Mr. Entine has been provided with. I would call him, if the Court allows me to, but I understand because of the late notice that Mr. Entine may object and he may be excluded. I am just making the request.

THE COURT: I wouldn't allow it unless we have some sort of summary of his testimony that Mr. Entine could review, and have an adequate opportunity to review, so he would be prepared for examination.

MR. SHEA: I can provide him with that this afternoon and if he wants to object, perhaps we can do that first thing in the morning.

THE COURT: Why don't we take it up tomorrow after Mr. Entine gets an opportunity to look at what I would require to be a relatively

detailed description of his testimony, detailed sufficiently so one could prepare an effective cross-examination, and maybe even then it wouldn't be proper. But until we see that, it is not ripe yet for a decision, I don't think.

MR. ENTINE: Your Honor, if I may, I have not only prepared cross-examination on all the witnesses but I have had extensive investigation conducted as well. This investigation has gone on for over two years. I don't think, unless what he has to say is just very cursory and noncontroversial, that I would be in a position to address that at this point.

THE COURT: Well, let's see what he has to say.

MR. ENTINE: Your Honor, however, I would assure the Court and Mr. Shea that I don't object to things pointlessly. It is always my position that I like to cooperate and I like to facilitate in getting all the witnesses here. I also find myself in a position of wanting to recall a witness that is available through the Commonwealth, and now I would again ask the Commonwealth if they would agree to have him reappear and not require us to issue a subpoena.

THE COURT: We have already visited that issue. You can take it up, probably, with Mr. Shea. They are under no obligation to do that. I can't order them to.

MR. ENTINE: They are not under any obligation, but --

THE COURT: I can't order the Commonwealth to do it, and that's the end of it.

MR. ENTINE: I am not requesting the Court to so order. I am just asking the Commonwealth to do that.

THE COURT: That's not my concern. You can ask them, but I don't need to take up the Court Reporter's time and my time to discuss that. If the testimony of this new witness does seem repetitive of what we have already had and the timing of this witness is such that you would have an ineffective time to cross-examine and the statement is sufficiently detailed so you can have sufficient time to have an effective cross-examination and you can get any criminal record should the witness have it, then I will consider the Commonwealth being able to do it. But those are a lot of if's, and until I have a chance to look at it I don't think there is any

reason for me prematurely decide the matter.

Anything else?

MR. SHEA: No, your Honor.

THE COURT: I am really a stickler for time, so I would appreciate if everybody is ready to go at nine o'clock tomorrow.

Mr. Shea, if you will, give Mr. Entine an idea of the witnesses that you plan to call tomorrow so he can be busy tonight.

MR. ENTINE: Thank you.

MR. SHEA: I will do that.

THE COURT: Thank you. I will be in recess.

(Whereupon, the hearing in the above-entitled matter was adjourned until Wednesday, February 28, 1996, commencing at 9:00 A.M.)

CERTIFICATE

I, Harry J. McKenna, Official Court Reporter for the Superior Court Trial Department of the Commonwealth of Massachusetts, do hereby certify that the foregoing is a true and accurate transcript in the matter of Commonwealth of Massachusetts versus Alfred Jenks, Essex County Case No. 9477-CR-1028 and 9477-CR-1029, heard on February 27, 1996.

Harry J. McKenna
Official Court Reporter

EXHIBIT C

VOLUME: 3
PAGES: 265

COMMONWEALTH OF MASSACHUSETTS

ESSEX COUNTY
CASE NOS. 9477-CR-1028-29

SUPERIOR COURT
FOR
CRIMINAL BUSINESS

---

COMMONWEALTH OF MASSACHUSETTS
PLAINTIFF,

VS.

ALFRED JENKS,
DEFENDANT.

---

BEFORE: WELCH, J., and a jury.

February 28, 1996.
Newburyport, Massachusetts.

FILED ... COURT
JUL 16 96
CLERK

APPEARANCES:

Gerald Shea, Assistant District Attorney, for the Commonwealth.

Benjamin Entine, Esq., for Alfred Jenks.

HARRY J. McKENNA
OFFICIAL COURT REPORTER

INDEX

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Daliah Campbell, resumed | 5 | 14 | | |
| Hans Casimir | 26 | 68 | 80 | |
| Wesner Charles | 81 | 97 | | |
| Fred Casimir | 104 | 126 | 136 | |
| Fitzgerald Mazil | 136 | 154 | | |
| Gerald Feigin | 176 | 190 | | |
| Lori Bunnell | 192 | 200 | | |
| Michael J. Lombard | 203 | 219 | 224 | 226 |
| Michael F. Coleman | 229 | | | |

EXHIBITS

| NO. | | IN EVID. | FOR ID. |
|---|---|---|---|
| 28 | Cassette tape. | 67 | |
| 29 | Autopsy photograph, (small.) | 182 | |
| 30 | Autopsy photograph, (small.) | 184 | |
| 31 | Autopsy photograph, (small.) | 185 | |
| 32 | Death certificate. | 192 | |
| 33 | Handgun. | 241 | |
| 34A | Manila envelope containing a shell casing. | 242 | |

| | | IN EVID. | FOR ID. |
|---|---|---|---|
| 34B | Manila envelope containing a shell casing. | 242 | |
| 34C | Manila envelope containing a shell casing. | 242 | |
| 34D | Manila envelope containing a shell casing. | 242 | |
| 34E | Manila envelope containing a shell casing. | 242 | |
| 34F | Manila envelope containing a shell casing. | 242 | |
| 35 | Bullet from wall (small manila envelope) | 245 | |
| 36 | Bullet from hallway floor (small manila envelope.) | 247 | |
| 37 | Photograph of ceiling tiles. | 250 | |
| 38 | Photograph of wall (small.) | 252 | |
| 39 | Photograph of beam section. | 253 | |
| 40 | Photograph from outside wall (small manila envelope.) | 254 | |
| 41 | Photograph of Trooper Coleman in ceiling. | 256 | |
| 42 | Photograph of outside wall. | 257 | |

| | | IN EVID. | FOR ID. |
|---|---|---|---|
| 43 | Photograph of Trooper Coleman in attic. | 259 | |
| 44 | Bullet from floor of attic (small manila envelope.) | 259 | |
| A | Bullet in manila envelope (small). | | 197 |
| B | Gun. | | 214 |
| C | Six manila envelopes of cartridges. | | 215 |

PROCEEDINGS

(February 28, 1996, Commonwealth of Massachusetts versus Alfred Jenks, third day.)

THE COURT: Good morning, ladies and gentlemen, and thank you for being so prompt. I apologize for the delay. It was unavoidable today, but let's make up for it by calling the first witness for today and we will proceed from there.

I believe we are still with the Commonwealth.

MR. SHEA: Yes, your Honor.

Miss Campbell is still on the stand.

THE COURT: Do you understand you are still under oath, Miss Campbell?

THE WITNESS: Yes, I do.

THE COURT: Keep your voice up so everyone can hear.

DALIAH CAMPBELL, RECALLED

DIRECT EXAMINATION, RESUMED

BY MR. SHEA:

Q Good morning.

A Good morning.

Q When we broke yesterday, we were in the middle of

your testimony. I would like to bring you back to the point where you observed Mr. Jenks in the main room of the club there on Market Street.

A Okay.

Q When you first observed Mr. Jenks, what was it that drew your attention to him?

A When he walked, when Lee was walking by and Lee was going towards Ferd he pulled out the gun and said: What's up now? That's how I noticed him. I didn't even know he was there.

Q So we are clear, who was it that pulled the gun out?

A Alfred Jenks.

Q Did you have an opportunity to see that weapon as it was pulled out of his waistband?

A Yes, I did.

Q Can you describe what color it was?

A It was a black handgun.

Q I show you this photograph marked Exhibit No. 25 and ask you to take a look at that?

A Yes. It did look like that, yes.

Q After the handgun was produced, what exactly occurred at that point?

A After the handgun was produced?

Q Speak up a little, please.

A Ferd Casimir ran over to him, held the gun in a downward position and told him to let it go, let it go, uncock it or whatever. I don't know too much about guns. Uncock it, something to that matter.

Q He was speaking to Mr. Jenks?

A Yes, he was.

Q And what did Mr. Jenks do when Mr. Casimir grabbed his hand?

A He was telling him to let him go and they were like spinning around and heading over toward the stage area.

Q Were they moving towards your position or away from your position?

A Away from my position.

Q Were there any other people in the immediate area where the two of them were struggling?

A There's people on the dance floor at the time. Yes, there were.

Q Exactly where in the room were you when you made those observations?

A I was near, I was near like right by the TV area near the front door.

Q Did you remain in that area for a period of time?

A Yes. Because I didn't believe the gun was

loaded.

Q So, did something occur after this Ferd and Mr. Jenks moved away from you towards the bar area during the struggle?

A I noticed Mr. Jenks had fell on the floor and after that it was, like it happened so quick, after he fell on the floor he jumped up, had the gun in his hand and was like, What's up now?, and waving, waving the gun in his hand: What's up now? What's up now? Then I heard the first shot go off and then I was down the stairs.

Q When the first shot went off, do you know where you were then?

A Yeah. I was in the same position.

Q When you heard that shot, did you do something?

A Everybody was coming towards me and they like pushed me out towards the door and I ended up tumbling down the stairs.

Q Could you see what occurred in that room when the gun was discharged, what all the people did?

A Everybody was scattering around. People was falling on the floor. People were running out the front door. It was just crazy.

Q When you saw Mr. Jenks as he shot that first shot off, was there anyone in contact with him at that

moment?

A Ferd was still near him and Junior and Hans and a couple other people were still around him.

Q But were they in physical contact with him after he shot the gun?

A After the first shot went over everybody scattered.

Q What happened when you went down the stairs?

A I was down on the sidewalk and --

Q You left and went all the way down to Market Street and left the building?

A Yeah. I was outside of the building downstairs right in front of the door downstairs.

Q How many people also left the building when you went outside?

A There was a lot of people that had left the building.

Q As you went down the stairs, did you hear other shots?

A Yeah. After the first shot went on there is, oh, it was like ongoing one after the other, one after the other.

Q When you got down to the sidewalk, how many people were down there?

A There was a lot of people downstairs on the

sidewalk.

Q Did something happen when you were down at the sidewalk?

A When I was downstairs I asked Ferd where was my sister.

Q Ferd was downstairs?

A Yeah. He was downstairs himself. He ran back upstairs and came back down and said like Ursula has been shot. I can't believe it. I, like for real, I started screaming and I fell onto the floor and then I started panicking and then I ran across the street and called 911.

Q After you did that, did something happen?

A After that, it's like right after I got back from using the phone Alfred Jenks jumped out of the window.

Q Did you actually see him jump out of the window?

A I was standing right there and he landed like right next to me.

Q Did you see him come down?

A I didn't see him come down. I seen him as he crashed through the glass and landed on the floor.

Q What happened after that?

A I seen a guy named Jason come over, take his arm,

swing it over his neck and some other guy swung his other arm over his neck an they had helped him across the street.

Q So, these two men, Jason and another man, helped Mr. Jenks across the street?

A Yes.

Q Is that towards the Brother's Restaurant?

A Yes.

Q The parking lot opposite the Market Street address?

A Yes.

Q Did you continue to watch them as they went across the street?

A Yes.

Q What did see when they got to the other side of the street? Was there anyone else over there?

A I seen a guy behind a car. His name is Bob. He was behind the wheel of the car at that time.

Q What kind of car was that?

A It looked to me like a gray Mustang. I don't remember.

Q So, he was in the car or behind it?

A He was, well, right there by the passenger, the driver's side door getting into the car and Jason and the other guy was helping Al into the car.

Q Were there other people around in front of the building at that time as these two men helped Mr. Jenks across the street?

A Yes. They were charging towards Al at the time.

Q They were going towards him?

A Yes.

Q Moving across the street?

A Yes.

Q How many people were involved in that group?

A I really don't have no idea.

Q Was it one or two or more?

A Probably more than two.

Q Did something happen as this group went across the street towards Mr. Jenks and the others?

A Yes. There was a gunshot.

Q Where was the gunshot from?

A Over by the car.

Q Once the gunshot was discharged, what did the group that was going towards Mr. Jenks do?

A They all just liked bent down, got down to the floor.

Q When you say "floor", down on the street?

A The street, yes.

Q Was there another shot?

A No.

Q Did you hear anyone say anything when the shot went off?
A They said: Get back.
Q Who said that? Was that coming from across the street?
A Yes.
Q Did the people that were crossing the street then return to your side of the street?
A After the car then screeched off.
Q Was Mr. Jenks in the car when it left, as far as you could tell?
A Yes, he was.
Q Now, you mentioned earlier, is it Digger?
A Yes.
Q His name is Mario sometimes?
A Yes.
Q You had a relationship with him at the time?
A Yes.
Q Did you see him that evening?
A We was together all that day. I just had a baby two weeks prior to that day and we was at the mall, me, him, my little sister and a couple other people.
Q Your sister Ursula?
A Yes.

Q Was Mario the father of the baby?

A Yes.

Q If you know, on that night did he have a weapon?

A Not that I know of, no.

Q Did you see him with a gun in his hand at anytime?

A No.

Q At anytime that evening while at the dance?

A No.

Q Did you see him on the sidewalk there that night after you came down downstairs and after Ursula was shot?

A Yes, I did.

MR. SHEA: I don't have any further questions of the witness at this time, your Honor.

THE COURT: Cross-examination.

<u>CROSS-EXAMINATION</u>

<u>BY MR. ENTINE:</u>

Q Good morning, Miss Campbell.

A Good morning.

Q The hall was rented that evening by the Casimirs. Is that correct?

A Yes.

Q And it was rented from Henderson Maynard. Is

that correct?
A Yes.
Q Henderson Maynard continued to operate the alcohol concession there, too, did he not?
A Yes, he did.
Q Selling to everyone that came up, didn't he?
A Yes, he did.
Q Carding no one, did he?
A He didn't card me.
Q There were plenty of juveniles at that party, too?
A Yes, there were.
Q They were all drinking, were they not?
A I don't know about all of them drinking. Some were drinking, yes.
Q There was no effort made to stop them?
A No, not that I know of.
Q And there was no effort to stop the drug usage there that night. Is that correct?
MR. SHEA: Objection.
A I didn't see anyone using drugs.
THE COURT: I am going to sustain the objection and strike the answer. That means think of your minds as sort of a blackboard. When I strike an answer, just erase it from your

minds.

I will sustain the objection and strike the answer.

Q There was a large crowd there that night, wasn't there?

A Yes, there were.

Q As you said, after the first shot you were out of the room. Is that correct?

A After the first shot, that's when people started running towards me, yeah.

Q So you didn't see anything that took place after that, did you?

A No.

Q Now, you said you were with Digger all that day?

A Yes.

Q Did you see Lee that day?

A I saw Lee when he pulled up, yes. No, not when he pulled up. When he pulled up they came upstairs and told me Leth was downstairs and me, my sister and cousin proceeded downstairs.

Q Lee knows Digger, too?

A There was a short period of time me and Lee lost contact and we recently started, probably like a couple weeks, before this incident.

Q You were with Dugger that night, right?

A I didn't go to the party with Digger, no.
Q You saw him there?
A Yes.
Q You saw him there, yes?
A Yes.
Q He was your boyfriend?
A Yes.
Q And the father of the child you just had?
A Yes.
Q You were with Lee at the party. Is that correct?
A Lee came after.
Q Lee came up to you, didn't he?
A Yes.
Q Now, did Henderson Maynard attempt to interfere with emergency services being summoned?
A Yes, he did.
Q What did he do?
A Well, I wasn't up there at the time, but according to what I heard from my brother he --

MR. SHEA: Objection, your Honor.

THE COURT: I will sustain it.

The witness can only testify to what she saw or heard.

THE WITNESS: Okay.

THE COURT: I am going to sustain the

objection. She doesn't have personal knowledge to this particular incident. So, I will sustain the objection.

MR. ENTINE: Your Honor, if I might inquire as to what she did know, personally observed.

THE COURT: She said she --

Well, did you observing anything regarding Mr. Maynard's efforts with emergency services?

THE WITNESS: No. I didn't see it myself. No.

Q Was there a particular reason that you went across the street to call 911?

A I was told that my sister's been shot.

Q Was there any attempt to deny access to telephones as far as you know?

A I was downstairs at the time. I had no problem in getting to a telephone, no.

Q Across the street?

A Yes.

Q If you know, did Mr. Maynard express concern as to the police coming while there was alcohol and minors there?

MR. SHEA: Objection.

THE COURT: Sustained.

Q If you know, Miss Campbell, did Mr. Maynard attempt to move your sister's body?

A He didn't go nowhere near her, no.

Q If you know, did he attempt to arrange to have that done?

A I don't know about him arranging. I know I heard it was suggested.

Q For what reason?

MR. SHEA: Objection, your Honor.

THE COURT: Sustained.

Q Where is Digger today?

A I do not know.

Q Is he a fugitive?

MR. SHEA: Objection, your Honor.

THE COURT: Sustained.

Q Was Digger involved in a kidnapping?

MR. SHEA: Objection, your Honor.

MR. ENTINE: May we approach, your Honor?

THE COURT: Yes.

<u>BENCH CONFERENCE RECORDED:</u>

THE COURT: Yes, Mr. Entine?

MR. ENTINE: Your Honor, I don't think that that necessarily calls for hearsay. I am asking whether or not she knows and what she is

aware of in connection with this, and I think it is relevant to a consideration of the activities of Digger Pareisi and that he is a significant player in connection with this. If her answer is a hearsay answer, then I don't want it.

THE COURT: Let's assume it is not hearsay, although to be not hearsay she would have to be, I gather, a coconspirator in a kidnapping.

MR. ENTINE: Or a victim.

THE COURT: Are you alleging that Pareisi kidnapped her.

MR. ENTINE: I wared has he kidnapped a one-year old child. It could be hers.

THE COURT: How do you get that in?

MR. ENTINE: Asking her. If she knows, she can testify to it.

THE COURT: If that's your response, I will sustain the objection.

MR. ENTINE: I would --

THE COURT: That's your response?

MR. ENTINE: I do believe that I can introduce any other record through this witness in connection with that.

THE COURT: How can you get the bad acts

in.

MR. ENTINE: Bad acts? Your Honor, I think it does show whether or not there was a basis for knowledge in the community as to whether or not Mr. Pareisi was of such a character that he was known to engage in violent acts and criminal acts. I think what she knows is relevant in also determining what is generally known in the community. As witnesses have said, everyone in the community knows everything about all these people.

THE COURT: Too peripheral. Denied. I will sustain the objection.

THE COURT:.

BENCH CONFERENCE CONCLUDED

THE COURT: Please proceed.

MR. ENTINE: Thank you, your Honor.

Q Did you go to the hospital that evening?

A No. I was unable to go to the hospital.

Q Were you at your mother's house later that evening?

A Later that evening pertaining to when? You mean right after?

Q Yes. And into the early morning hours.

A I received a ride from a friend of mine to go get

my mother because they wouldn't let me get back up in the club to see, you know, how bad she was hurt.

Q Yes. And were you present at your mother's house when a stabbing took place?

A Yes, I was.

Q And that stabbing involved parties in connection with this incident?

A Yes. Ferd Casimir, yes.

Q And your cousin. Isn't that correct?

A It is my uncle.

Q Your uncle?

A Yeah.

Q I see. But there was a stabbing which took place at your mother's house?

A Yes, it did.

Q And another ambulance that had to be summoned for another victim. Is that correct?

A Yes.

Q And an arrest was made in connection with that?

A Yes.

Q Now, you had been friends with Leth Delva for how long?

A It had to be about seven years.

Q I see. And you had been friends with Dugger for

how long?

A Four.

Q And Dugger is also known as, you said, by the name of Wallen Esperance?

A Yes.

Q He also is known by the name Mario, is he not?

A Yes.

Q And he is also known by the name of Dega Pareisi?

A Dega is a nickname.

Q It is a nickname?

A Yes.

Q Pareisi is also another name for him?

A Pareisi is his real name.

Q You are acquainted with him by all of those names. Is that correct?

A Yes.

Q You are also acquainted with Shirley Gilmore, are you not?

A Yes.

Q She is a friend of yours?

A Yes.

Q You are also a friend of Euloge Gaston?

A Euloge, yes.

Q He is a friend of yours?

A He is not a friend of mine. He is a friend of

Digger's. I wouldn't call him a friend. He is an acquaintance.

Q I beg your pardon?

A I wouldn't call him a friend. I call him an acquaintance.

Q Is Dugger also a cousin of the Casimirs?

A No.

Q There is no relationship between him and the Casimirs?

A No.

Q Are you sure about that?

A I am positive.

Q Okay. Do you know whether or not, do you know whether or not Lee is related to any of these people as well?

A No, he is not.

Q Do any of the members of this group, have they had a romantic relationship with Lee?

A No.

Q Your cousin has not had such a relationship with Lee?

A She had a relationship with Lee, yes.

Q To this day everyone remains on friendly relations?

A I don't live in this town. I don't speak to no

one in here. Not with me, no.

Q Not with you but with the family?

A My family doesn't live here any longer either.

Q There is no Nonons that live in Lynn any longer?

A There is not.

Q Your whole family lives in Brooklyn, New York?

A Yes.

Q Did you --

THE COURT: Just a moment. One at a time. Let her answer the questions fully.

You were asked had the whole family moved to Brooklyn. What was your answer?

THE WITNESS:. That's where we were originally from.

MR. ENTINE: No further questions.

THE COURT: Any redirect?

MR. SHEA: No further questions, your Honor.

THE COURT: Thank you. You may step down.

(Witness excused.)

THE COURT: The Commonwealth may call its next witness.

MR. SHEA: The Commonwealth calls Hans Casimir, your Honor.

A The same time.

Q So, it was contemporaneous with them trying to get the gun away that you saw that happen?

A Right. At the same time, yes.

MR. SHEA: No further questions.

THE COURT: Anything further.

MR. ENTINE: No, your Honor.

THE COURT: You may step down. Thank you very much.

(Witness excused.)

THE COURT: The Commonwealth may call its next witness.

MR. SHEA: Wesner Charles, your Honor.

WESNER CHARLES, SWORN

DIRECT EXAMINATION

BY MR. SHEA:

THE COURT: Good morning, sir. Please keep your voice up in terms of any answers that you give. Okay? It is a big courtroom and your voice really needs to carry. So, really speak out.

All right.

Q Good morning, Mr. Charles.

A Good morning.

Q I want you to speak up louder than that because

all these people have to hear your answers. All right?

A Yeah.

Q First, state your full name and spell your last name?

A Wesner Charles. C-H-A-R-L-E-S.

Q Where do you live, sir?

A Lynn, Massachusetts.

Q Who do you live with?

A My fiance.

Q How old are you?

A Twenty-three.

Q What is your High School -- Excuse me. What is your educational background?

A College.

Q How far did you go?

A One year to go.

Q So, you have completed three years of college?

A Correct.

Q Where did you go to school?

A Fitchburg State.

Q What was the course of study you studied there?

A Industrial technology.

Q Are you presently employed?

A Yes.

Q Where are you working, sir?

A Eaton Corporation in Beverly.

Q What kind of work do you do for Eaton Corporation?

A Electrical mechanical assembler.

Q How long have you had that job?

A About four months.

Q Mr. Charles I want to draw your attention to the evening of April 1st, 1994. Do you recall that night?

A The date, no. I know the night we are talking about, but I can't tell you the exact date if I have to say it offhand.

Q Do you recall going to a dance or party at 36 Market Street in Lynn in April of 1994?

A Yeah.

Q And do you recall who you went to that dance with?

A Yes.

Q Who did you go there with?

A My fiance.

Q What is her name?

A Eve Murat.

Q M-U-R-A-T?

A Yeah.

Q Do you know what time you and your fiance arrived there that evening?

A I don't know the specific time. I'd say between, between nine and eleven I'd say.

Q And what happened after you got there? What did you do?

A We hung around the dance for awhile and then I went to get or to go to Chian -- Whatever the Chinese restaurant is there.

Q The China Lion?

A Yes. We went there to get something to eat and then came back upstairs.

Q What time was it you returned to the dance after going out for a bite to eat?

A Once again, it was about a half-hour, a half-hour, forty-five minutes from the time that we left, got there and left and came back. About a half-hour, forty-five minutes after that.

Q Sometime during the evening while you were there that night did something take place that caught your attention?

A Yeah.

Q What was it that you first noticed or what happened that caused you to pay attention to it at that time?

A We were there for awhile and then everybody was having a good time, the music was funky and everything was straight and then there was an altercation. There was an altercation and then there was a struggle over by the corner.

Q When you say the corner, where were you standing in the room?

A Where was I standing in the room? Let's say -- Is there a diagram here or something?

Q Yes. There is a diagram over there. Would it be helpful if you made reference to that?

A Yes.

Q Let me move it a little closer to you, sir.

(Short pause.)

Mr. Charles, why don't you step down and come over to this diagram and use this pointer. I want you to stand on this side so that the jurors will not be blocked by your body as you refer to it. Can you identify --

THE COURT: Can the jurors see?

(Jurors responded in the affirmative.)

Q Can you see where you entered the room when you first came in?

A I think we entered about here. About there.

Q Do you see the bar's location?

A Right here.

Q Where were you standing?

A I was standing right about here, right in this area.

Q Where was it that you noticed this altercation?

A About here in this area.

Q Over in the corner by the stairs?

A Right.

Q Thank you, sir. You can resume the stand?

A (Witness complied.)

Q When you saw this -- Well, exactly what was it that you saw at first?

A I saw -- I wasn't too sure what the altercation was about.

Q When you say altercation, are you speaking about a physical contact between two people?

A There was, there was a lot of verbal and there was some physical. There was a lot of verbal. It wasn't exactly yet physical. Then I saw, I saw this gentleman over here.

Q Are you referring to Mr. Jenks here?

A Correct.

Q Do you know him by name?

A Not personally. I seen him maybe one other time from that night in my life.

Q Anyway, you saw this gentleman there?

A Correct. I saw him. I saw him over there with a gun, okay, and there were several people around him trying to get the gun away from him.

Q So, he was holding the gun in his hand?

A Correct.

Q Did you see what kind of gun it was?

A Yeah. I can, I can, I can describe it, yeah.

Q If I show you this photo, can you recognize it if you saw it? Did it look like that?

A Yeah.

THE COURT: You are showing him exhibit?

MR. SHEA: Exhibit 25.

THE COURT: Okay.

Q Did you know any of the other people that were trying to take the gun away from Mr. Jenks?

A Yeah.

Q Who were they?

A I saw Hans. No, actually I saw Ferd.

Q Ferd?

A Yeah.

Q Casimir?

A Casimir and what we refer to this guy as Digger.

Q Digger?

A Yeah. They were in a struggle to get the gun.

Q Once they were struggling there, did something occur?

A Yeah. Then, you know, there was a lot of movement because he must have had a real, real tight grip on the gun because they were moving all around with the gun and over by the side, you know. I was looking for an opportunity to snatch onto it myself, you know, hoping if the gun falls off or falls down I'll just grab it and do whatever. The gun never came out of him at that point. Then they got like towards the center, real more towards the center.

Q More towards the center of the room?

A Right. During the altercation he let the gun go or the gun got knocked out of his hand.

Q Was he standing up at that time?

A When he was holding the gun, yes.

Q When it was knocked out of his hand I mean?

A When the gun landed, when the gun landed he was on the ground then, okay, because they had gotten him down. He was on the ground then and, of course, he just picked up the gun.

Q So, he regained control of the gun?

A He regained control of the gun.

Q Did anyone else have possession of the gun at

anytime?

A After that, no.

Q What happened after Mr. Jenks regained control of the gun?

A He fired it.

Q In which direction?

A The first shot, the first shot, I would have to say the first shot was in the air.

Q And after he fired the first shot in the air?

A After he fired the first shot, then I think he stood up. He stood up. You know, after the first shot it got everybody's attention. Everybody started screaming and running and looking for cover.

Q The people that were in the struggle with him, did they stay in contact or move away from him when he shot that first slot?

A No. At that point he was alone, by himself.

Q When he stood up, what did he do then?

A He shot.

Q Can you --

A Hmm, hmm?

Q I would like you, if you can, describe his movement with the gun. Where was he pointing it at?

A The first one, once again, like I said, the first one was up in the air. Then, you know, he was completely by himself and then he just began shooting and talking. You know: What the fuck. Boom.

Excuse me language.

What the fuck. He just kept shooting.

Q As he did that, was he looking or pointing in a specific direction?

A He shot at -- He shot in several different directions. I think I would have to say he was shooting looking for somebody or shooting to shoot for somebody.

Q Why do you say that?

A Because at that point I'm over by -- My vision is not exactly that well. Can I show you from there?

Q Yes.

(Witness approached the diagram.)

A At that point I am about in this area, okay, and he's about there, somewhere in this area, okay. I'm about here, and when he, when he looked at it, he pointed it toward my direction. At that point it was too late for me to run for cover, you know, and I figured a man with a gun in his

hand, I'm not about to take chances, so I froze and stared at him and wishing we'd make eye contact so he'd see I'm not moving and he won't attack me.

Q Did you make eye contact with him?

A We made eye contact for a real quick second, yeah.

Q Then what happened?

A He didn't shoot me.

Q What did he do after he made eye contact with you and broke eye contact? Did he move?

A After he broke eye contact, yeah.

Q You may resume the stand.

A (Witness complied.)

Q Now --

A After he broke eye contact he shot again. You know, he went around and shot again more towards that area, more closer towards the bar area, in that vicinity, and he just kept firing.

Q Did you continue to watch him?

A What?

Q Did you continue to watch him with the gun?

A Yeah.

Q Did he stay in the same position or move to another position?

A No. He was moving around shooting. He was moving around shooting.
Q What happened after he fired these shots?
A After, you know, the motion of the hand was like this type thing, you know, what the fuck still, and at that point, after his last shot I remember he fired again but nothing came out.
Q Now, was there anyone in his line of vision at the time that he fired or attempted to fire that last time?
A I really couldn't say at that point.
Q Do you recall in which direction --
A I remember. I remember, you know, seeing nothing come out of there.
Q What did he do after he did that?
A He tried to cock it back. He tried to cock it or reload it or whatever. I remember him running downstairs. You know, after him trying to run, then there was people trying to hold him downstairs on the stairs. That's what I remember.
Q Where were you at that time?
A At that point I'm still inside. You know, I saw him run. I'm not too sure if you, you know, if the gun was stuck or he was completely out of

bullets, so I wasn't about do chase a man with a gun. So, I'm still in the room, and then I went to go downstairs by the stairs and I saw, I saw the struggle and eventually he made his way downstairs. He made his way downstairs. I went downstairs and came back up, you know, because when I came downstairs I was looking to see if my fiance was around because there was shooting and I was making sure she wasn't hit. I looked outside and asking: Where's Evie? You know, asking anybody: Where's Evie? I didn't get a response or anything.

Then he was running back up the stairs, at which point I gave way to the side, you know, not knowing what he had in his hand because he wasn't in my sight for a moment.

Q Going upstairs?

A He ran up the stairs. Then I realized I saw people running in that direction and I was ahead of them and I ran up after him. We ran up the stairs. We went up the stairs and then he went up by the bathroom area. Okay? That's when I was coming up the stairs and I said: Oh, shit. Somebody's -- Ursula, she's been hit.

Q Did you know Ursula?

A Yeah.

Q How did you know her?

A We all, we all, we all pretty much hung around together. She was a friend of mine's girlfriend.

Q Who is your friend?

A David Mazil.

Q So you saw Ursula there when you came up to the top of the stairs?

A No. When I came upstairs past the bar.

Q You were in the hall at about the room's end?

A Yeah.

Q Where was Mr. Jenks at that time?

A At that time he was gone. He must have flown. I didn't see him anywhere in sight.

Q What happened when you got to the place where you saw Ursula?

A When I saw Ursula, seeing she was already hit I tried, I said: Help. Help. Somebody's been hit. Ursula's been hit.

Q Was anybody with her at the time?

A At the time nobody was there. The only person that might have seen her was Mr. Jenks himself because, you know, where she was, where she was lying down, in order for him to get into the bathroom he had to jump over her.

MR. ENTINE: Objection, your Honor.

THE COURT: Sustained.

This witness cannot tell us what Mr. Jenks saw. He can only tell us what he saw.

THE WITNESS: Okay.

Q At any rate, sir, once you came upon Ursula lying there, you stopped. Did the other people that were running up the stairs behind you come by?

A Yeah. People were coming by, yeah. Actually, yeah. Euloge, Euloge came by and I said: We've got to do something. We've got to do something. So, I took off my sweater. I was wearing a sweatshirt and I took that off because, you know, she was bleeding a lot. There was a lot of blood by her nose and she was having a tough time breathing. I figured if she got, you know, some of the breathing space through her nostril she'd be better off. Breathing space is always good for you, you know.

So then, because the blood was real thick, too, we had to try to get something to move it to the side. So, me and Euloge, we attempted to break down the door, the female door, the female bathroom door. That's where she was, right in front of that.

Q Okay.

A So, you know, we kicked, kicked and kicked and tried to ram through that door. We got the door open and there was a few people who came out of it.

Q Out of the Ladies' Room you mean?

A The Ladies' Room, correct.

Q You were trying to get in there for what reason, to get towels?

A To try to get some water so we can clean her up a little bit. So, I'm still saying, you know: Get help. Get help. Get help. We were on the ground for awhile. I'm not sure of the time spent, but with a life on the line every minute seems hours.

Q How long did you stay with her?

A I stayed with her until the ambulance came.

Q Did the police come before the ambulance?

A Yeah.

Q Did you remain with her until that time?

A I remained with her at that time.

Q What about Hans Casimir, do you know him?

A Yes.

Q Was he there with you and Euloge?

A When me and Euloge were there, I'm not too sure

if he was there or not. Because when the police got there, they were telling everybody to stay back. To stay back. You know: She needs breathing space. It looked like, you know, he knew what he was doing.

Q Did you have a gun there with you that night?

A No.

Q Did you get searched when you went in?

A Yeah.

Q Did you see anyone else other than Mr. Jenks with a gun in that dance that night?

A No.

Q Did you go outside at anytime prior to Ursula being taken away by the ambulance?

A No. The police wouldn't let me.

MR. SHEA: Thank you, sir.

I have no further questions of the witness at this time, your Honor.

THE COURT: Cross-examination.

CROSS-EXAMINATION

BY MR. ENTINE:

Q Mr. Charles, you said you were quite a good friend of Ursula's. Is that correct?

A Not good friends with Ursula. We all hung around. I don't know any of her personals. I

don't know much of her personals. All I know is she was a friend of a friend of mine and I respected her.

Q Part of the same group which you hung around with?

A Yeah.

Q And Euloge was part of that same group?

A Yes.

Q Do you know a fella named Lee Delva?

A I didn't know him prior to that night. I knew of him after we got to the police station.

Q You didn't see Lee at the party?

A I saw Lee at the party.

Q What did you see Lee doing?

A What did I see Lee doing?

Q Yeah.

A The only reason why I saw Lee at the party is because everybody at the party was, basically, people that we knew and he was only a strange face that I didn't know.

Q But you didn't know Mr. Jenks, did you?

A I had seen Mr. Jenks.

Q But you didn't see Mr. Jenks and Leth Delva in a conflict, did you?

A No.

Q How many shots did you see fired into the air?
A I couldn't exactly give you a specific number.
Q Well, you testified that the first shot went into the air?
A Correct.
Q How many other shots went into the air?
A I really couldn't give you a specific number.
Q You really couldn't?
A No.
Q And you really couldn't give a specific number as to how many went in other direction, could you, sir?
A No.
Q You have also testified that you feel the conflict started in this area, is that correct, the area by the platform and the wall opposite the bar? Isn't that correct, sir?
A In that general area, yeah.
Q Then you said that you saw it move to the center. Is that correct, sir?
A Yes.
Q And then you said you saw it move to this side. Is that correct, sir?
A No.
Q All right. Sir, where was Mr. Jenks when the

shots went off?

A When the shots went off towards the center.

Q In the center. And Mr. Jenks was not over by this side when the shots went off. Isn't that correct, sir?

A When the shots went off he was towards the center.

Q That's right, sir. So, if I might clarify for the record, Mr. Jenks was not standing by this wall opposite the bar when the shots went off. Isn't that correct, sir?

A When the shots went off?

Q Yes, sir.

A He was standing more towards the center.

Q Thank you, sir. Then you did see the conflict move to this side of the room. Is that correct, sir?

A No.

Q I see. You didn't see Mr. Jenks standing over here by the bar, sir?

A By the bar? I can show you where he was, the general area.

Q I am asking you specifically did you see Mr. Jenks standing in the area by the bar?

THE COURT: During the time of the

gunshots?

MR. ENTINE: Pardon me?

THE COURT: During the time of the gunshots?

MR. ENTINE: Yes, sir.

A No. It was more towards the center.

Q You also were positioned close by the bar, weren't you, sir?

A Yeah, fairly.

Q What was going on at the bar?

A At the bar?

Q Yeah.

A People were running for cover.

Q Prior to that, earlier in the party was the bar open for business?

A The bar was open for business.

Q Who was selling the drinks?

A Unknown.

Q An older fella?

A Yes.

Q I see. How old were you at the time of the party?

A Excuse me?

Q How old were you at the time of the party?

A How long ago was this?

Q 1994?

A In 1994 -- I am twenty-three now.

Q Were you carded at the bar?

A Was I carded?

Q Yes.

A No.

Q No one else was carded, were they?

A Unknown. I am not anyone else.

Q Did you see anybody carded at the bar?

A No. I didn't care to see anybody at the bar.

Q What about any of your friends, did you happen to notice any of your friends drinking?

A Yes.

Q And the alcohol was being supplied at the party, was it not?

A Repeat the question.

Q The alcohol was being supplied at the party?

A The person I saw drinking was somebody that I gave a sip of my beer to.

Q You gave a sip of your beer to?

A Yes.

Q That's the only person that you saw drinking?

A Excuse me?

Q That's the only person that you saw drinking?

A That's the only person I cared about drinking.

Q I didn't ask what you cared about. I asked what you saw.

A No, I didn't see. I don't know if other people were drinking.

Q I see. Do you know if other people were using drugs?

A That I didn't see either.

Q I see. So, you could see from one side of the room to the other, you could see to the bar and you could see to the door, but you --

MR. SHEA: Objection, your Honor.

Q -- but you couldn't see what was going on inside the room. Is that true?

MR. SHEA: Objection.

THE COURT: Sustained.

Q Now, you of testified that Digger was also in the middle of this. Is that correct?

A Yes. He was somebody trying to help take the gun away.

Q I am sorry?

THE COURT: He was someone trying to help take the gun away.

MR. ENTINE: I see, your Honor.

Q Is Digger also a friend of yours?

A Yes.

Q Where is Digger today?
A I really don't know.
Q Have you seen him recently?
A What do you call recently?
Q Well, do you or have you seen him within the past three months?
A No.
Q I see. Now, Digger is also a friend of the Nonons, is he not?
A Yes.
Q And Digger is a relative of the Casimirs, isn't he?
A Yes.

MR. ENTINE: I have nothing further at this time, your Honor.

THE COURT: Redirect?

MR. SHEA: No questions.

THE COURT: Thank you very much. You may step down.

(Witness excused.)

THE COURT: The Commonwealth may call its next witness.

MR. SHEA: Frank Casimir (Harry, check the name that he just called. Too much noise ((. .

<u>FRED CASIMIR, SWORN</u>